**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Armando Herrera, Stephanie Michaelle Medina Sarita, Rebecca Castillo Prenza, Jamilka Vargas Alcantara, Nicole Hidalgo, Emeka Raymond Obi, and Emily Feliciano, *on behalf of themselves and all similarly situated employees*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>Stellar Wireless Retail, LLC, Stellar Wireless Retail NY Inc., Stellar Wireless Group Retail, LLC, Stellar Wireless Retail, LLC, Stellar Wireless Metro Retail, LLC, Portables Unlimited, Inc., Portables Unlimited NY, LLC, Portables Unlimited USA, LLC, The Portables Choice Group LLC, and The Portables Choice Group AZ, LLC,<br><br>*Defendants*. | **FLSA COLLECTIVE AND RULE 23 CLASS ACTION COMPLAINT**<br><br>**<u>Jury Trial Demanded</u>** |

Plaintiffs Armando Herrera, Stephanie Michaelle Medina Sarita, Rebecca Castillo Prenza, Jamilka Vargas Alcantara, Nicole Hidalgo, Emily Feliciano, and Emeka Raymond Obi ("Plaintiffs"), by their attorney Mohammed Gangat, Esq., complaining of defendants Stellar Wireless Retail, LLC, Stellar Wireless Retail NY Inc., Stellar Wireless Group Retail, LLC, Stellar Wireless Retail, LLC, Stellar Wireless Metro Retail, LLC, Portables Unlimited, Inc., Portables Unlimited NY, LLC, Portables Unlimited USA, LLC, The Portables Choice Group LLC, and The Portables Choice Group AZ, LLC (collectively "Defendants"), respectfully alleges as follows:

1.     Plaintiffs allege Defendants are liable to Plaintiffs and all similarly situated employees for violations of the Fair Labor Standards Act and New York Labor Law ("NYLL"). This lawsuit seeks to recover on behalf of Plaintiffs and all similarly situated employees (1) unpaid minimum wages; (2) unpaid overtime wages; (3) untimely wage compensation; (4)

unpaid spread of hours pay; (5) unpaid commissions) and (6) statutory penalties for failure to provide compliance wage notice and wage statements.

2.      Plaintiff Stephanie Michaelle Medina Sarita, Rebecca Castillo Prenza, and Nicole Hidalgo each bring a claim for pregnancy discrimination and retaliation under the New York State Human Rights Law and New York City Human Rights Law.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), and 28 U.S.C. §§ 1331 and 1337 and 1343 and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because at least one defendant resides in the district and the conduct making up the basis of the complaint took place in this judicial district.

## THE PARTIES

5.      Plaintiff Stephanie Michaelle Medina Sarita is an adult, over eighteen years old, who currently resides in Bronx County in the State of New York

6.      Plaintiff Armando Herrera is an adult, over eighteen years old, who currently resides in Bronx County in the State of New York

7.      Plaintiff Rebecca Castillo Prenza is an adult, over eighteen years old, who currently resides in Queens County in the State of New York

8.      Plaintiff Jamilka Vargas Alcantara  is an adult, over eighteen years old, who currently resides in Bronx County in the State of New York

9.      Plaintiff Nicole Hidalgo is an adult, over eighteen years old, who currently resides in Bronx County in the State of New York

10.     Plaintiff Emily Feliciano  is an adult, over eighteen years old, who currently resides in New York County in the State of New York

11.     Plaintiff Emeka Raymond Obi is an adult, over eighteen years old, who currently resides in Kings County in the State of New York.

12.     Upon information and belief, Defendants Stellar Wireless Retail LLC, Stellar Wireless Metro Retail LLC, The Portables Choice Group LLC, The Portables Choice Group AZ LLC, Stellar Wireless Retail USA LLC, Stellar Wireless Retail NY Inc., Stellar Wireless Group Retail LLC, Portables Unlimited Inc., Portables Unlimited USA LLC, Portables Unlimited Realty LLC, and Portables Unlimited NY LLC (collectively, "Defendants") constitute a single integrated enterprise and/or joint employers under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

**Corporate Formations and Registrations**

13.     Stellar Wireless Retail LLC  is a domestic limited liability company registered in New York State with DOS ID 6722631. It was formed on February 2, 2023, and is currently active under Section 203 of the Limited Liability Company Law. The company is registered in Rockland County, with its next statement due on February 28, 2025. Any service of process upon the Secretary of State will be mailed to "THE LLC" at 136 First Street, Nanuet, NY 10954.

14.     Stellar Wireless Metro Retail LLC is a domestic limited liability company registered in New York State with DOS ID 6722631. It was formed on February 2, 2023, and is currently active under Section 203 of the Limited Liability Company Law. The company is

registered in Rockland County, with its next statement due on February 28, 2025. Any service of process upon the Secretary of State will be mailed to "THE LLC" at 136 First Street, Nanuet, NY 10954.

15.     Stellar Wireless Retail NY Inc. is a domestic business corporation registered in New York State with DOS ID 7443768. It was formed on October 16, 2024, and is currently active under Section 402 of the Business Corporation Law. The company is registered in Kings County, with its next statement due on October 31, 2026. Any service of process upon the Secretary of State will be mailed to "STELLAR WIRELESS RETAIL NY" at 2005 86th Street, Brooklyn, NY 11214.

16.     Stellar Wireless Group Retail, LLC is a domestic limited liability company registered in New York State with DOS ID 5159787. It was formed on June 23, 2017, and is currently active under Section 203 of the Limited Liability Company Law. Its statement status is "PAST DUE DATE," having been due on June 30, 2019. The company is registered in Nassau County. Any service of process upon the Secretary of State will be mailed to "STELLAR WIRELESS GROUP RETAIL, LLC" at 12A Commercial Street, Hicksville, NY 11801.

17.     Portables Unlimited, Inc. is a domestic business corporation registered in New York State with DOS ID 2374357. It was formed on May 4, 1999, and is currently active under Section 402 of the Business Corporation Law. The company is registered in Westchester County, with its next statement due on May 31, 2025. Any service of process upon the Secretary of State will be mailed to "PORTABLES UNLIMITED, INC." at 136 1st Street, Nanuet, NY 10954. The CEO is listed as "Raja R. Amar" at the same address.

18.     The Portables Choice Group, LLC is a domestic limited liability company registered in New York State with DOS ID 5959461. It was formed on March 9, 2021, and is

currently active under Section 203 of the Limited Liability Company Law. The company is registered in Rockland County, with its next statement due on March 31, 2025. Any service of process upon the Secretary of State will be mailed to "THE PORTABLES CHOICE GROUP LLC" at 136 1st Street, Nanuet, NY 10954. The registered agent is "Lawrence D. Melchionda" at the same address.

19.    Portables Unlimited NY, LLC is a domestic limited liability company registered in New York State with DOS ID 6662859. It was formed on December 6, 2022, and is currently active under Section 203 of the Limited Liability Company Law. Its statement status is listed as "PAST DUE," with a due date of December 31, 2024. The company is registered in Rockland County. Any service of process upon the Secretary of State will be mailed to "THE LLC" at 136 First Street, Nanuet, NY 10954.

20.    Portables Unlimited USA, LLC is a domestic limited liability company registered in New York State with DOS ID 5651321. It was formed on November 6, 2019, and is currently active under Section 203 of the Limited Liability Company Law. Its statement status is "PAST DUE," with a due date of November 30, 2021. The company is registered in Rockland County. Any service of process upon the Secretary of State will be mailed to "c/o Jaspreet S. Mayall, Esq." at Certilman Balin Adler & Hyman, 90 Merrick Avenue, East Meadow, NY 11554.

21.    Portables Unlimited Realty, LLC is a domestic limited liability company registered in New York State with DOS ID 2982363. It was formed on November 26, 2003, with a duration through December 31, 2053. It is currently active under Section 203 of the Limited Liability Company Law. Its statement status is "PAST DUE," with a due date of November 30, 2021. The company is registered in Rockland County. Any service of process upon the Secretary of State will be mailed to "THE LLC" at 136 1st Street, Nanuet, NY 10954.

22.     The Portables Choice Group AZ, LLC is a domestic limited liability company registered in New York State with DOS ID 6358338. It was formed on December 27, 2021, and is currently active under Section 203 of the Limited Liability Company Law. Its statement status is "PAST DUE," with a due date of December 31, 2023. The company is registered in Rockland County. Any service of process upon the Secretary of State will be mailed to "c/o THE LLC" at 136 First Street, Nanuet, NY 10954.

**Background of the Portables and Stellar Enterprises**

23.     The various Portables entities were created to sustain an enterprise formed in the New York Metropolitan Area in 1999 by Defendant-owner Raja Amar as a local wholesaler for T-Mobile products and services. By 2020, Portables had expanded through territory growth and acquisitions to become T-Mobile's largest wholesaler, with offices in Nanuet (NY), Houston (TX), and Los Angeles (CA). Its revenue exceeded $100 million, and it oversaw more than 300 exclusive T-Mobile/MetroPCS locations and over 1,000 multi-carrier retail outlets nationwide. At that time, Portables had a national sales staff, dedicated customer service and commission departments, and two strategically located warehouses (in NY and CA). Its two principal owners, Raja Amar and Larry Melchionda, have been in the wireless industry since its inception and remain actively involved in daily operations.

24.     Portables made two significant acquisitions: 40 MetroPCS retail locations from Stellar Wireless Group, and SXS Success Mobility, a manufacturer of wireless accessories.

25.     In July 2021, two long-standing national wireless distribution companies—Portables Unlimited Inc. and Choice Products and Services Inc.—combined to form "The Portables Choice Group." They now maintain three principal locations: The Portables Choice Group Corporate Office: 136 First Street, Nanuet, NY 10954; The Portables

Choice Group – Syosset Corporate Office & Distribution Center: 135 Eileen Way, Syosset, NY 11791; and The Portables Choice Group – California Warehouse.

26.    In July 2021, two long-standing national wireless distribution companies, Portables Unlimited Inc. & Choice Products and Services Inc. combined forces to become the major leader in Wireless. The merged company now maintain three principal locations: (i) The Portables Choice Group Corporate Office, Nanuet, 136 First Street Nanuet, NY 10954, Telephone: 845-507-8200; Monday, Friday 9AM-6PM EST; (ii) The Portables Choice Group – Syosset Corporate Office & Distribution Center 135 Eileen Way Syosset, NY 11791 Telephone: 516-496-9494 Monday – Friday 9AM-6PM; and (iii) The Portables Choice Group – California Warehouse Telephone: 323-545-8903 Monday – Friday 8AM-3PM PST.

27.    The various Stellar entities were created to operate retail locations for major cell phone carriers like MetroPCS and T-Mobile in New York City. For instance, Stellar Wireless Group was formed as a separate business entity, with Stellar Wireless Retail LLC established in June 2016 and Stellar Wireless Group Retail LLC established in June 2017.

28.    The owners of the Stellar enterprise sold their business to the owners of the Portables enterprise, which was (and is) party to agreements with major cell phone carriers, whereby it operates as an authorized dealer for MetroPCS and T-Mobile. Under these agreements, the authorized dealer is bound to assume and maintain full responsibility for supervising and controlling all employees working at the retail locations, including those where Plaintiff worked.

29.    All of the stores operate similarly. They sell cell phones, phone plans for MetroPCS and Metro by T-Mobile, offer financing contracts through Smartpay, and sell cell phone accessories sourced from Avelex, SSX/Side by Side, and from MetroPCS or Metro by

T-Mobile directly.

**Post-Acquisition and Merger Integration**

30.    Upon information and belief, in or around October 2018, Portables acquired approximately 40 MetroPCS retail locations operated by Stellar, establishing control over Stellar's operations while retaining the Stellar brand identity.

31.    Despite this acquisition, Portables maintained separate Stellar corporate entities as operational subsidiaries. They preserved the Stellar brand while integrating management, control, and operational functions.

32.    Following the acquisition, Portables and Stellar effectively operated as a single integrated enterprise with common ownership, management, and control of labor relations.

33.    In July 2021, Portables Unlimited Inc. merged with Choice Products and Services Inc. to become "The Portables Choice Group." This merged entity continued to operate the Stellar Wireless entities as subsidiaries or divisions.

34.    After the 2021 merger, Stellar Wireless publicly held itself out as "a division of The Portables Choice Group, LLC," acknowledging its subsidiary relationship.

35.    Following this merger, new corporate entities were formed to reflect the expanded business operations, including Stellar Wireless Metro Retail LLC (formed June 2021), The Portables Choice Group LLC (formed March 2021), and The Portables Choice Group AZ LLC (formed December 2021).

**Common Ownership, Management, and Control**

36.    Seven of the eleven Defendant entities—Stellar Wireless Retail USA LLC, The Portables Choice Group AZ LLC, The Portables Choice Group LLC, Portables Unlimited NY

LLC, Portables Unlimited Inc., Portables Unlimited Realty LLC, and Stellar Wireless Metro Retail LLC—share the same business address at 136 First Street, Nanuet, NY 10954.

37.     Two principal Defendant entities—Portables Unlimited, Inc. and The Portables Choice Group LLC—are registered to the same physical address with overlapping executive leadership, demonstrating continued centralized management after the 2021 merger.

38.     Lawrence D. Melchionda serves as a registered agent for The Portables Choice Group LLC at 136 First Street, Nanuet, NY, while Raja R. Amar serves as CEO of Portables Unlimited, Inc. at the same address. Both are principal owners who remain "actively involved" in day-to-day operations.

39.     Attorney Jaspreet S. Mayall, Esq. of Certilman Balin Adler & Hyman, LLP serves as a designated agent for service of process for multiple Defendant entities across both the Portables and Stellar businesses, demonstrating coordinated legal representation.

40.     Nine of the eleven Defendant entities are registered in Rockland County, New York, evidencing geographic concentration and administrative centralization under common control.

41.     After the 2018 acquisition and 2021 merger, Defendants continued to operate under two principal brand families—"Portables" and "Stellar"—functioning as related business lines under common ownership and control.

42.     [30] In July 2021, The Portables Choice Group owned and operated "over 225 Metro by T-Mobile locations as well as over 1501 Multi-Carrier locations," consolidating the previously separate businesses under unified control.

**Unified Business Model and Operations**

43.    Defendants' business operations are interrelated, all focused on the retail sale of cell phones, phone plans, and accessories, primarily as authorized dealers for MetroPCS and T-Mobile.

44.    Defendants operate a unified business model across their retail locations, applying standardized sales practices, commission structures, staffing models, and management oversight.

45.    Defendants maintain centralized control over labor relations, including hiring, termination, scheduling, and compensation of employees across their various entities and retail locations.

46.    Employees, including Plaintiffs, were frequently transferred between different store locations operated by different Defendant entities but managed as part of the same integrated enterprise.

47.    Defendant Miguel Aquije, employed by Portables, regularly visited Stellar-branded locations to monitor operations, direct employees, and exercise supervisory authority, further demonstrating the interrelated nature of operations post-acquisition.

48.    Defendant entities share common financial control, with overlapping ownership interests and profit-sharing arrangements between the Portables and Stellar businesses following the 2018 acquisition.

49.    Defendants commingled finances, resources, and operations, functioning as a single economic entity despite legally distinct corporate forms.

50.    Defendants maintain a common personnel management system, and employees

were often unaware which specific legal entity was their technical employer following the acquisition and merger.

51.    Defendants share common equipment, supplies, and business systems across various retail locations, regardless of which entity "operates" a given location.

52.    Operational decisions affecting all Defendant entities are made by a common group of managers and executives, demonstrating unified operation and control.

53.    Defendants' websites link directly to one another, further demonstrating interrelated operations and a public presentation of connected entities.

54.    Defendants hold monthly meetings for retail sales associates from more than 25 different stores operated by various Defendant entities, where they provide centralized guidance on sales, commissions, and other policies.

55.    Senior executives from Portables entities, including "Raja Shah," regularly attend these management meetings with Stellar Wireless employees, exercising control and oversight across entity boundaries.

**Shared Personnel and Executive Overlap**

56.    Sonny Massand uses email addresses with both the @pcgwireless.com (Portables) and @swgretail.com (Stellar) domains. His business signature includes both "The Portables Choice Group, LLC" and "Stellar Wireless Retail, LLC," demonstrating a dual role across entities.

57.    Mr. Massand, identified as an owner and operator of Stellar Wireless, publicly lists his WhatsApp Business profile under "~Portables Choice Group," showing his involvement with both organizations.

58.     Hemant Haryani, who manages payroll for Stellar Wireless employees, publicly identifies as "~Hemant H. Stellar – Portables Unlimited," indicating a formal business relationship between the two entities.

59.     [47]    Mr.    Massand's    WhatsApp    Business    profile    links    to "https://www.pcgwireless.com," with "PCG" referring to Portables Choice Group. His profile also describes business activities typical of Portables Choice Group: "Metro By T-Mobile Wholesaler" and "T-Mobile Prepay Master Dealer."

60.     Both executives publicly represent themselves as simultaneously part of Stellar and Portables, rather than as employees of separate, independent businesses.

61.     Defendants use official business communication channels to identify executives as representing both Stellar and Portables, constituting an admission of the integrated nature of these "separate" businesses.

**Coordinated Hiring and Employment Policies**

62.     Defendants' hiring processes are coordinated, with employees from both Portables and Stellar involved in hiring and onboarding, regardless of the entity that technically employs the new hire.

63.     Defendants share employee information and human resources documentation via email domains from both companies.

64.     The Portables Choice Group has described Stellar Wireless as "a division of" The Portables Choice Group in business records and communications, acknowledging their integrated structure post-acquisition.

65.     Defendants' employment policies—scheduling, discipline, commission structures,

wage payment, and more—are substantially identical across all entities, whether operating under the "Portables" or "Stellar" name.

**Joint Employer and Single Integrated Enterprise Allegations**

66.     Defendants constitute a "single integrated enterprise" and/or "joint employers" under applicable law because they share common ownership, financial control, interrelated operations, common management, and centralized labor relations.

67.     Defendants share a leadership structure in which Portables provides financial and operational oversight, including authority over employee hiring, firing, and supervision.

68.     Sonny Massand is an owner/operator of Stellar, sits at the top of Stellar's organizational chart, and also serves as an employee of Portables. He uses both @pcgwireless.com and @swgretail.com email addresses.

69.     Mr. Massand's business signature block, as of September 2022, included both "The Portables Choice Group, LLC" and "Stellar Wireless Retail, LLC."

70.     The companies share a coordinated hiring process. For example, when Plaintiff Armando Herrera was promoted to District Manager of several Stellar stores, he was required to seek hiring approval from both Mr. Massand (Stellar/Portables) and Miguel Aquije (Portables).

71.     When employees are hired by Stellar, key personnel involved include individuals using both Portables (@pcgwireless.com) and Stellar (@swgretail.com) emails. Hiring documentation is circulated among these employees, further evidencing integrated operations.

72.     Portables exercised authority over Plaintiffs' employment by setting and controlling the manner of work. For instance, Mr. Aquije visited the stores weekly, monitored employee performance, directed their work, and took corrective action, including reprimanding

Plaintiff for uniform violations.

73.    Portables also played a direct role in firing employees for performance issues. Mr. Aquije instructed Mr. Herrera on which employees needed performance warnings and terminations.

74.    Upon information and belief, Defendants were joint employers as they are jointly owned and operated, regularly interchanged merchandise and employees, and supervised Plaintiffs among various locations and corporate entities.

75.    Defendants operate a joint enterprise under the FLSA and NYLL, sharing centralized management and control over essential functions such as training, supervision, and employment policies.

76.    Defendants use the same corporate logo, phone number, and administrative offices, indicating uniform branding and centralized administration.

77.    Defendants hold monthly meetings attended by retail sales associates from over 25 stores. Management provides standardized job instructions, commission policy updates, and performance metrics. Raja Shah, CEO of Portables Unlimited, Inc., has attended these meetings in a management capacity, sometimes accompanying Chetan "CJ" Jagota (an employee of both Portables Unlimited, Inc. and Stellar Wireless Retail, LLC) to multiple store locations.

78.    On the website for Portables Unlimited, Inc., job postings are advertised for retail positions at more than 40 MetroPCS locations owned and operated by Portables, including those where Plaintiffs worked.

79.    Defendants had the power to hire, fire, determine rates of pay, set work schedules, supervise and control job functions, and otherwise affect Plaintiffs' employment conditions.

80.     Defendants acted intentionally and maliciously. They are employers under the FLSA, 29 U.S.C. § 203(d) and 29 C.F.R. § 791.2, as well as under NYLL § 2 and its regulations, and are jointly and severally liable as "Corporate Defendants."

**Enterprise Coverage**

81.     Upon information and belief, at all relevant times, the Corporate Defendants were, and continue to be, an "enterprise engaged in commerce" under the FLSA. They each (i) have employees engaged in commerce, or in the production of goods for commerce, or who handle goods or materials that have been moved in commerce; and (ii) have an annual gross volume of sales of not less than $500,000.

82.     Defendants have maintained control, oversight, and direction over Plaintiffs and similarly situated employees, including timekeeping, payroll, and other uniform employment practices.

83.     Stellar currently operates stores at the following locations (among others): 1541 Westchester Avenue; 133 Fulton Avenue; 917 Mott Avenue 142 West 32nd Street; 2185 White Plains Road; 1032 Westchester Avenue; 3971 White Plains Road; 102 East 167th Street; 1175 Webster Avenue; 1985 Great Neck Road; 2385 Grand Concourse; 37 Glenn Street; 477 Maple Avenue; 2011 Mott Avenue; 1937 Westchester Avenue; 348 Main Street; 2823 Third Avenue; 646 Route 109; 1625 Westchester Avenue; 652 Fulton Avenue; 204 Broadway.

84.     As of 2022, Stellar was known to operate numerous additional retail cell phone stores originally branded "MetroPCS" and later rebranded as "Metro by T-Mobile." These locations included, but were not limited to: 133A Fulton Avenue, Hempstead, NY; 477 Maple Avenue, Westbury, NY 11590 1985 Great Neck Road, Copiague, NY 11727; 221 Broadway, Amityville, NY; 646 Route 109, Lindenhurst, NY 11757; 201 Mott Avenue, Lawrence, NY

11559; 1014 Park Street, Peekskill, NY 10566; 3667 Broadway, New York, NY 10031; 102-44 Jamaica Avenue, Richmond Hill, NY 11418; 45 Newkirk Plaza, Brooklyn, NY 11226; 1462 Hudson Avenue, Rochester, NY 14621; 2284 Lyell Avenue, Rochester, NY; 525 Titus Avenue, Rochester, NY; 522 Lake Avenue, Rochester, NY; 691 East Main Street, Rochester, NY; 999 East Ridge Road, Rochester, NY; 1168 Portland Avenue, Rochester, NY; 4163 Union Road, Cheektowaga, NY 14227; 455 Fulton Street, Brooklyn, NY; 300 Avenue U, Brooklyn, NY; 2015 Avenue U, Brooklyn, NY; 455 Sutter Avenue, Brooklyn, NY; 1110 Pennsylvania Avenue, Brooklyn, NY; 110 Malcolm X Blvd, Brooklyn, NY; 8515 Flatlands Avenue, Brooklyn, NY; 1883 Rockaway Parkway, Brooklyn, NY; 1706 Atlantic Avenue, Brooklyn, NY; 110-32 Farmers Boulevard, St. Albans, NY; 29-12 36th Avenue, Astoria, NY; 25-09 Astoria Boulevard, Long Island City, NY; 1343 Ogden Avenue, Bronx, NY 10452; 2962 Jerome Avenue, Bronx, NY 10468; 5314 Church Avenue, Brooklyn, NY; and 652 Fulton Avenue, Hempstead, NY.

85.    By virtue of the foregoing, Defendants are collectively responsible as a single integrated enterprise and/or joint employers for any violations alleged under the FLSA and NYLL.

**Employment of Plaintiff Stephanie Michaelle Medina Sarita**

86.    Stephanie Michaelle Medina Sarita employment with Defendants began in or around June 2024 until approximately October 25, 2024.

87.    Armando Herrera, as District Manager, together with Miguel and Sunny hired Stephanie. Stephanie was referred to Armando by one of Armando's friends.  Armando discussed the hire with Miguel and said she never worked retail but I want to give her a shot. Miguel authorized the hire.  With Sunny, a similar conversation occurred where Armando informed Sonny of his intention to hire Stephanie, and Sunny said gave his authorization.

88.     She worked at several locations in the Bronx.

89.     She typically worked 57 to 73.5 hours per week.

90.     She regularly worked 6-7 days per week.

91.     Her workdays were typically from 9:30 a.m. - 7:00 p.m. or 8:00 p.m.

92.     She would generally work alone in these stores so she was not allowed to close the doors to have her lunch and was expected to eat when she could.

93.     She would be sent to different stores on a changing schedule by defendants.

94.     She was paid $15 per hour for her first 40 hours per week via direct deposit.

95.     Any hours over 40 were paid at the same hourly rate with no overtime premium.

96.     Stephanie once worked 15 consecutive days without a day off.

97.     She punched in and out using the store's POS system.

98.     She took screenshots of some of her weekly hours, which confirm that she worked over 40 hours in those weeks. She was never provided a copy of the hours she worked on a weekly basis.

99.     Defendants never provided time-and-a-half pay for any of Stephanie's overtime hours.

100.    Plaintiff met a coworker that worked at other stores owned by Defendants named Emily. She too was paid similarly in the sense that she was not paid overtime pay for working over 40 hours per week.

101.    Stephanie traveled to the Dominican Republic from September 2 to 17, 2024, due to the death of a family member who died.

102.    Stephanie informed her manager Mario that she was taking time off due to the death of a family member, and even while she was there he was rushing her to come back from her bereavement because they needed people at the store.

103.    On October 17, 2024 Plaintiff went to the Emergency Room because she was not feeling well as she was pregnant and was having discomfort. She was seen by the doctor on call at the emergency room at NYP-Allen Hospital. The doctor advised her that her pregnancy was at risk and was to avoid working for the next two days through October 19, 2025.

104.    Plaintiff, however, still went to work on October 18 on October 19, because she felt she was able to work, and also no one else was scheduled to work and did not want to have to tell her managers that she was pregnant and had to miss work and scared that she would lose her job.

105.    On October 20, 2024, Plaintiff was too much in pain and sick to go and so she contacted Mario Ramos, who was her manager, via text messages.

106.    Stephanie disclosed her pregnancy and emergency to Mario. Mario, nevertheless, terminated her after learning she had stopped working due to feeling ill. Plaintiff informed Mario that she had a doctor's note to prove that she was sick but he was not interested in seeing the note.

107.    She was terminated on October 25, 2024.

108.    Mario first told her she was let go because she did not speak Spanish. He also informed Plaintiff that under NY law he was able to fire anybody who doesn't obey his orders.

109.    However, her termination letter stated she was late and did not meet performance expectations.

110.    It is clear that Defendants terminated Plaintiff's employment because of her missing work due to she called out sick due to her pregnancy complications.

111.    Defendants never asked her to provide any medical documentation nor did they ask her to come back to work.

**Employment of Nicole Hidalgo**

112.    Nicole Hidalgo worked for Defendants for over a year, from approximately May 2023 until May 2024.

113.    Ms. Hidalgo worked at multiple Metro by T-Mobile store locations operated by Defendants, including: a. 1625 Westchester Avenue; b. 1032 Westchester Avenue; c. 2823 3rd Avenue;  d. 1175 Webster Avenue; and e. 1541 Westchester Avenue (main location)

114.    Ms. Hidalgo was primarily stationed at 1541 Westchester Avenue (the "main store") for approximately half of her employment period, which was one of Defendants' highest-revenue locations.

115.    Ms. Hidalgo worked full-time, six to seven days per week typically working from opening until closing hours (9:30 AM to 7:00 or 8:00 PM).

116.    Ms. Hidalgo often had to stay past the 7:00 PM closing time to:   a. Complete transactions with customers who entered the store late;   b. Attend mandatory meetings;   c. Process end-of-day cash counts and deposits.

117.    Ms. Hidalgo was paid $16.00 per hour with no raises during her employment.

118.    Ms. Hidalgo earned commission based on phone and accessory sales, but Defendants failed to provide any written commission structure or policy.

119.    The commission system was verbally explained, requiring employees to sell a

certain number of phones and accessories to qualify.

120.    Ms. Hidalgo manually tracked her own sales to verify commission payments, as Defendants did not provide a system for employees to monitor their sales metrics.

121.    Ms. Hidalgo's highest commission payment was approximately $600, with most commission payments being around $200 or less, despite her consistently high sales performance. This was paid approximately every month

122.    Ms. Hidalgo frequently questioned the accuracy of her commission payments, comparing her self-documented sales to the amounts received.

123.    During her employment, Ms. Hidalgo interacted with multiple managers including:  a. Mario, who would later terminate her employment; and b. Miguel (known as "the small guy"), who exercised supervisory authority;

124.    Ms. Hidalgo became pregnant during her employment with Defendants.

125.    Ms. Hidalgo initially attempted to hide her pregnancy from management, but Miguel approached her when she was approximately three months pregnant and stated, "We know you're pregnant."

126.    After Defendants discovered Ms. Hidalgo's pregnancy, they began treating her differently in the following ways: a. Reassigning her from the high-volume 1541 Westchester location (where she had worked for approximately half a year) to lower-volume locations;  b. Frequently changing her work location with little notice, sometimes calling her to relocate during the same workday;  c. Requiring her to travel between multiple locations without compensation for transportation costs; d. Sending her to locations where she would generate fewer sales and thus earn less commission; and e. Changing their attitude and demeanor toward

her, creating a hostile work environment

127.    As Ms. Hidalgo's pregnancy advanced to approximately six months and her condition became visibly apparent, Mario began visiting her assigned stores more frequently and monitoring her more closely.

128.    As part of her job duties, Ms. Hidalgo was responsible for conducting daily cash counts, placing cash in envelopes with documentation, securing it in the safe, and preparing it for pickup every two to three days.

129.    On or about May 30, 2024, Ms. Hidalgo conducted her normal end-of-day cash count procedures. She placed the main deposit in the safe but noticed approximately $50 remaining on the counter as she was leaving. Concerned about security, she took the $50 with the intention of returning it the next day.

130.    On or around May 31, 2024, Mario confronted Ms. Hidalgo about the $50, claiming they had video evidence of her taking the money.

131.    Ms. Hidalgo immediately acknowledged having the money and explained she had closed out the register for the day, the $50 had been erroneous left out of the close out process, and so she had kept it aside with the intention of including it in the next day's count when she opened the register.

132.    Despite her explanation and attempt to correct the mistake, Mario terminated Ms. Hidalgo on the spot, approximately six months into her pregnancy.

133.    Ms. Hidalgo's termination for an alleged $50 discrepancy was pretextual and disproportionate to the claimed offense, particularly given: a. Her immediate acknowledgment and explanation;   b. Her consistent work history with no prior similar incidents;   c. The timing

coinciding with her advanced pregnancy;  and d. The pattern of negative treatment that began when her pregnancy was discovered.

134.    Defendants never provided Ms. Hidalgo with proper wage notices or statements as required by New York Labor Law.

135.    Defendants failed to maintain accurate records of Ms. Hidalgo's hours worked and wages earned, in violation of state and federal record-keeping requirements.

136.    Upon information and belief, Defendants' treatment of Ms. Hidalgo is part of a pattern and practice of discrimination against pregnant employees, as evidenced by similar treatment of other female employees who became pregnant during their employment with Defendants.

**Employment of Armando Herrera**

137.    Armando Herrera worked for Defendants from on or around October 13, 2023, to September 13, 2024.

138.    Initially he was working in store as a Manager.  Approximately 6 months later he was promoted to District Manager.

139.    He initially worked at 1541 Westchester Avenue in the Bronx for about four to five months.

140.    Herrera earned $15 per hour throughout his employment.

141.    He received no overtime pay for hours worked beyond 40 per week.

142.    Herrera clocked in and out using the store's POS system while serving as a store-level employee.

143.    He typically worked six to seven days per week, from approximately 9:30 AM to

7:00/7:30 PM.

144.    Herrera often worked over 40 hours per week but did not receive time-and-a-half. Plaintiff would raise the issue of overtime pay to Defendants but Defendants would make excuses and deflect the question. They did promise that he would receive overtime pay eventually.

145.    Management told him that commission would substitute for overtime premiums.

146.    Commission plans required selling 65 phones and $5,000 in accessories each month.

147.    Herrera's commission ranged from $1,000 to $2,000 monthly, depending on sales performance.

148.    After 1–2 months at the Bronx store, Herrera was promoted to District Manager.

149.    As District Manager, he oversaw five Stellar/PCG stores: 1625 Westchester Avenue, 2883 Third Avenue; 1032 Westchester Avenue; 999 Southern Boulevard; 2383 Grand Concourse.

150.    Herrera continued to earn a base wage of $15 per hour plus a $1,200 monthly stipend.

151.    Plaintiff was required to work 7 days per week due to his new position as District Manager.

152.    As District Manager, Herrera's duties included: Creating and managing employee schedules; Overseeing store-wide sales performance; and Reporting directly to Sunny (Sonny) Massand and Portables representatives including Miguel.

153.    Plaintiff was never given paystubs or wage notices throughout his employment.

154.    Plaintiff was never given a full 30 minute break for lunch and had to eat whenever there was time.

**Employment of Jamilka Vargas Alcantara**

155.    Alcantara worked for Defendants for more than six months, approximately from April 2023 to November 2023.

156.    Alcantara worked at multiple Metro by T-Mobile store locations operated by Defendants in the Bronx, including:   a. 2385 Grand Concourse; b. 102 East 167th Street; c. A third location in the Bronx (specific address not recalled). She also worked one half-day at a White Plains location at the request of her manager.

157.    Alcantara worked full-time, typically Monday through Friday, with additional weekend shifts (Saturday and Sunday) on an alternating basis. Plaintiff would work between 5 and 6 days per week.

158.    When Alcantara worked weekend shifts, she would sometimes be given one or two weekdays off to compensate, though her schedule changed frequently.

159.    Ms. Vargas Alcantara's typical workday began at 9:30 AM. Her shift would end at 7:00 PM at some locations and 8:00 PM at the Grand Concourse location.

160.    Plaintiff was never given a full 30 minute break for lunch and had to eat whenever there was time.

161.    Alcantara regularly worked more than 40 hours per week when assigned weekend shifts.

162.    Plaintiff was paid $17 per hour by Defendants.

163.    Alcantara was paid via direct deposit to her Chime account.

164. Defendants never provided Alcantara with paystubs or any written documentation of her hours worked or rate of pay.

165. Defendants never informed Alcantara of her hourly rate; she simply received payment for her work.

166. Alcantara did not receive overtime compensation at one-and-a-half times her regular rate when she worked more than 40 hours per week.

167. Alcantara earned commission on one occasion in the amount of approximately $500. The commission structure was verbally explained to her by Armando but was never provided in writing.

168. During her employment, Ms. Vargas Alcantara encountered Miguel who would visit the stores to check on operations. On these visits, Miguel would:  a. Provide input on sales techniques;   b. Instruct Ms. Vargas Alcantara on how to speak to customers;   c. Offer opinions and direct her to make adjustments to her work; and   d. Attend store promotional events

169. Ms. Vargas Alcantara participated in promotional events organized by the Defendants where they would bring in DJs, distribute flyers, and attempt to attract customers into the stores.

170. Ms. Vargas Alcantara received training in-store from Armando and another worker for approximately 3-4 days while she was working.

171. Ms. Vargas Alcantara was terminated by Defendants after they monitored her personal phone conversation through store cameras during her assignment at the White Plains location. She was told she was being fired for "arguing on the phone" during a personal call while dealing with a family issue.

172.    Defendants never provided Ms. Vargas Alcantara with proper wage notices or statements as required by New York Labor Law.

173.    Defendants failed to maintain accurate records of Ms. Vargas Alcantara's hours worked or wages earned, in violation of state and federal record-keeping requirements.

174.     Ms. Vargas Alcantara was not paid overtime wages for hours worked in excess of 40 per week, in violation of the FLSA and New York Labor Law.

**Employment of Emily Feliciano**

175.    Feliciano worked for Defendants for more than six months, approximately from April 2023 to November 2023.

176.    Ms. Feliciano worked at multiple Metro by T-Mobile store locations operated by Defendants in the Bronx, including:   a. 2385 Grand Concourse; b. 102 East 167th Street; c. A third location in the Bronx (specific address not recalled). She also worked one half-day at a White Plains location at the request of her manager.

177.    Ms. Feliciano worked full-time, typically Monday through Friday, with additional weekend shifts (Saturday and Sunday) on an alternating basis. Plaintiff would work between 5 and 6 days per week.

178.    When Ms. Feliciano worked weekend shifts, she would sometimes be given one or two weekdays off to compensate, though her schedule changed frequently.

179.    Ms. Feliciano's typical workday began at 9:30 AM. Her shift would approximately end around between 7:15 and 7:30 PM at some locations and 8:00 PM at the Grand Concourse location.

180.    Plaintiff was never given a full 30 minute break for lunch and had to eat whenever

there was time.

181.    Ms. Feliciano regularly worked between 48.75 and 59.25 hours per week.

182.    Plaintiff was paid approximately $16 per hour by Defendants.

183.    Ms. Feliciano was paid via direct deposit to her bank account.

184.    Defendants never provided Ms. Feliciano with paystubs or any written documentation of her hours worked or rate of pay.

185.    Defendants never informed Ms. Feliciano of her hourly rate; she simply received payment for her work.

186.    Ms. Feliciano did not receive overtime compensation at one-and-a-half times her regular rate when she worked more than 40 hours per week.

187.    Ms. Feliciano earned commission on one occasion in the amount of approximately $500. The commission structure was verbally explained to her by Armando but was never provided in writing.

188.    During her employment, Ms. Feliciano encountered Miguelwho would visit the stores to check on operations. On these visits, Miguel would:  a. Provide input on sales techniques;   b. Instruct Ms. Feliciano on how to speak to customers;   c. Offer opinions and direct her to make adjustments to her work; and   d. Attend store promotional events

189.    Ms. Feliciano participated in promotional events organized by the Defendants where they would bring in DJs, distribute flyers, and attempt to attract customers into the stores.

190.    Ms. Feliciano received training in-store from Armando and another worker for approximately 3-4 days while she was working.

191.    Ms. Feliciano was terminated by Defendants after they monitored her personal

phone conversation through store cameras during her assignment at the White Plains location. She was told she was being fired for "arguing on the phone" during a personal call while dealing with a family issue.

192.    As of the date of her communication with Plaintiff's counsel, Ms. Feliciano had not yet received her W-2 form from Defendants despite it being required by law.

193.    Defendants never provided Ms. Feliciano with proper wage notices or statements as required by New York Labor Law.

194.    Defendants failed to maintain accurate records of Ms. Feliciano's hours worked or wages earned, in violation of state and federal record-keeping requirements.

195.     Ms. Feliciano was not paid overtime wages for hours worked in excess of 40 per week, in violation of the FLSA and New York Labor Law.

**Employment of Rebecca Castillo Prenza**

196.    Rebecca worked for Defendants from approximately November 1, 2023, until on or around April 11, 2024.

197.    Ms. Castillo worked at a Metro by T-Mobile store located at 1032 Westchester Avenue.

198.    Ms. Castillo worked five days per week for 42.5 regular hours and sometimes worked a sixth day, adding approximately 10 additional hours of overtime every other week.

199.    Ms. Castillo's regular schedule was from approximately 10:00 AM to 7:30 PM, it would take her about 30 minutes to close up the store after the store would be closed to the public.

200.    Plaintiff was not given a proper 30 minute lunch break and had to eat whenever

there was free time.

201.    Once a month, and later on in the employment switching to once a week, Ms. Castillo was required to perform inventory duties that required her to arrive at 7:30 AM or 8:00 AM, approximately 2-2.5 hours before her regular start time.

202.    Ms. Castillo was paid $16.50 per hour for her regular hours.

203.    For overtime hours beyond 40 per week, Ms. Castillo was paid in cash at the regular rate of $15.00 per hour instead of the legally required time-and-a-half rate.

204.    Ms. Castillo was also entitled to commission payments based on her sales performance, but Defendants consistently underpaid her commissions.

205.    Defendants never provided Plaintiff with a written and detailed explanation of the commission structure.

206.    On one specific occasion, Ms. Castillo was entitled to approximately $1,000 in commission based on her sales metrics, but Defendants only paid her $500.

207.    Ms. Castillo was frequently the only employee staffed at her location, being left alone to handle all store operations.

208.    Ms. Castillo became pregnant during her employment with Defendants.

209.    After Ms. Castillo's supervisor Sunny learned of her pregnancy, she experienced differential treatment, including: Being singled out and "picked on" during a staff meeting; Being left to work alone despite her pregnancy requiring accommodations such as assistance with lifting the security gate; and Receiving pushback when requesting additional staffing support.

210.    Ms. Castillo eventually was forced to quit her position because: Defendants

consistently failed to pay her earned commissions; Defendants failed to pay proper overtime wages; and Defendants failed to reasonably accommodate plaintiff during her pregnancy and for treating her differently after knowing about her pregnancy.

211.    During her employment, Ms. Castillo interacted with Miguel (last name unknown), who appeared to be employed by Portables and exercised supervisory authority by: Visiting the store approximately once per week; Checking on sales performance; Instructing Ms. Castillo on customer interactions; and directing her work activities.

212.    Defendants never provided Ms. Castillo with proper wage notices or statements as required by New York Labor Law.

213.    Defendants required Ms. Castillo to perform manual labor, including lifting security gates and handling inventory, yet failed to pay her within seven calendar days after the end of the week in which these wages were earned, as required for manual workers under New York Labor Law.

**Employment of Emeka Raymond Obi**

214.    Plaintiff Emeka Raymond Obi began working for Defendants on or around September 2016 working at a Metro PCS store located at 1883 Rockaway Parkway, Brooklyn, NY. Thereafter he worked at various other locations including 8815 Flatlands Avenue, Brooklyn; 455 Sutter Avenue, Brooklyn; 1110 Pennsylvania Avenue, Brooklyn; 300 Avenue U Brooklyn; 2015 Avenue U Brooklyn; 1706 Atlantic Ave, Brooklyn.

215.    In the years 2016, 2017, and 2018, Plaintiff Emeka Raymond Obi worked approximately nine months per year, and in 2019, he worked for approximately 5 months, until May 2019 when he quit.

216.    Plaintiff Emeka Raymond Obi was employed for Defendants as a salesperson of phone plans, phones, and accessories.

217.    Plaintiff Emeka Raymond Obi's work was done entirely at Defendants' stores.

218.    All of Plaintiff Emeka Raymond Obi's work for Defendants was performed within New York City.

219.    Plaintiff Emeka Raymond Obi typically worked seven days a week for twelve hours each day, from 8 am to 8 pm and was paid at the same hourly rate of $11.00 per hour for all hours worked, including overtime hours.

220.    Plaintiff was not given a proper 30 minute lunch break and had to eat when there was time.

221.    Defendants regularly subtracted from Plaintiff Emeka Raymond Obi's wages the value of missing inventory that Defendants erroneously attributed to Plaintiff.

222.    Plaintiff never received any pay stubs or wage notices

223.    Plaintiff was paid in cash.

224.    Plaintiff never received overtime pay when working over 40 hours per week.

**Payroll, Management, and Oversight**

225.    Sonny Massand was the President of Stellar Wireless.

226.    Hemant Harani handled payroll for Stellar Wireless employees on Sonny's behalf.

227.    Andrea handled commission calculations for Stellar Wireless employees.

228.    Miguel was employed by Portables and served as an account manager overseeing Stellar's stores.

229.    Miguel visited each store 3–4 times per week to monitor sales, observe camera footage, and track employee performance.

230.    Miguel reported directly to Larry and/or other owners at PCG.

231.    Miguel instructed Herrera to fire employees who did not meet PCG's performance or conduct standards.

232.    Miguel specifically directed Herrera to terminate about four or five employees.

233.    Miguel also discussed with Herrera that he was concerned about Stephanie's work performance, specifically her language skills.

234.    When Herrera objected or sought leniency on behalf of employees, Miguel said "We're not a charity company" and demanded immediate action.

235.    Portables had real-time access to sales data, camera feeds, and employee schedules at Stellar stores.

236.    Portables required Stellar to share store profits or pay a percentage of revenue to PCG.

237.    Portables, through Miguel and other personnel, determined when employees should be terminated or have hours reduced.

238.    Portables required Stellar Wireless to meet certain sales targets each month to maintain its sub-dealer status.

239.    T-Mobile's records list PCG as the owner of many retail locations that Stellar managed.

240.    Portables and Stellar Wireless websites confirm that Stellar is a division of PCG.

241.    Plaintiffs and similarly situated employees worked over 40 hours per week

without receiving time-and-a-half overtime.

242.    Plaintiffs did not have a written employment contract with Defendants.

243.    Plaintiffs never received any written notice from Defendants concerning how much they were being paid for overtime rate and how many overtime hours they worked each week.

244.    The weekly wages paid to Plaintiff failed to compensate Plaintiff at an amount sufficient to equal the minimum due, when accounting for minimum wage, overtime and spread-of-hours pay, under New York Labor law for non-exempt employees working for an employer based in New York City with more than ten (10) employees.

245.    A more precise statement of the hours and wages will be made when Plaintiff obtains the wage, time, and employment records Defendant was required to keep under the NYLL (NYLL 195 and 12 NYCRR 142-2.6).

246.    Plaintiff incorporates herein accurate records of his time, wages, and employment that Defendants were required to keep pursuant to the NYLL.

247.    At all times relevant herein, Defendants did not provide Plaintiff with the notice(s) required by NYLL 195(1).

248.    At all times relevant herein, Defendants did not provide Plaintiff with the statement(s) required by NYLL 195(3).

249.    Upon information and belief, and at all relevant times herein, Defendants failed to display federal and state minimum wage/overtime posters.

250.    Upon information and belief, and at all relevant times herein, Defendants failed to notify Plaintiff of his federal and state minimum wage and overtime rights and failed to inform

Plaintiff that he could seek enforcement of such rights through the applicable government enforcement agencies.

251.    Defendants knowingly and willfully failed to pay Plaintiff his lawfully earned wages for each hour of employment in direct contravention of the FLSA and New York Labor Law's minimum wage requirements.

252.    Defendants knowingly and willfully failed to pay Plaintiff his lawfully earned overtime compensation in direct contravention of the FLSA and New York Labor Law.

253.    Defendants knowingly and willfully failed to pay Plaintiff his lawfully earned "spread of hours" premium in direct contravention of the New York Labor Law.

254.    During his employment, over twenty-five percent of Plaintiff's duties were physical tasks.

255.    Despite regularly spending more than twenty-five percent of his shift performing these physical tasks, Plaintiff has been compensated by Defendants on a bi-weekly basis.

256.    Plaintiff has satisfied all conditions precedent to the institution of this action, or such conditions have been waived.

## COLLECTIVE ACTION ALLEGATIONS

257.    Plaintiff brings this action individually and as class representative on behalf of himself and all other current and former non-exempt employees who have been or were employed by Defendants in the three year period preceding the filing of this action, (the "Collective Action Period"), and who were compensated: at rates less than the applicable minimum wage for straight time hours and at rates less than one-half times the applicable minimum wage for all hours worked in excess of forty (40) hours per workweek (the

"Collective Action Members").

258.    Upon information and belief, the collective action class is so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts upon which the calculation of that number are presently within the sole control of the Defendants, upon information and belief, there are more than forty (40) Collective Action Members who worked for the Defendants during the Collective Action Period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, or knowledge of their claims. Therefore, Plaintiff submits that this matter should be certified as a collective action under the FLSA, 29 U.S.C. § 216(b).

259.    Plaintiff will fairly and adequately protect the interests of the Collective Action Members and has retained counsel that is experienced and competent in the fields of employment law and class action litigation. Plaintiff has no interests that are contrary to or in conflict with those members of this collective action.

260.    This action should be certified as a collective action because the prosecution of separate actions by individual members of the class would create a risk of either inconsistent or varying adjudications with respect to individual members of the class, or adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudication, or substantially impair or impede their ability to protect their interests.

261.    A collective action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, inasmuch as the damages suffered by individual Collective Action Members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the

members of the collective action to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a collective action.

262. Questions of law and fact common to the members of the collective action predominate over questions that may affect only individual members because Defendants have acted on grounds generally applicable to all members. Among the common questions of law and fact common to Plaintiff and other Collective Action Members are:

    a. Whether the Defendants employed Plaintiff and the Collective Action Members within the meaning of the FLSA;

    b. Whether the Defendants failed to keep true and accurate time and pay records for all hours worked by Plaintiff and the Collective Action Members;

    c. What proof of hours worked is sufficient where the employer fails in its duty to maintain time records;

    d. Whether the Defendants failed to pay the Plaintiff and the Collective Action Members overtime compensation for all hours worked in excess of forty (40) hours per workweek, in violation of the FLSA and the regulations promulgated thereunder;

    e. Whether the Defendants' violations of the FLSA are willful as that term is used within the context of the FLSA; and,

    f. Whether the Defendants are liable for all damages claimed hereunder, including but not limited to compensatory, liquidated and statutory damages, interest, attorneys' fees, and costs and disbursements.

263. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a collective action.

264.    Plaintiffs and others similarly situated have been substantially damaged by the Defendants' wrongful conduct.

## CLASS ACTION ALLEGATIONS

265.    Plaintiff sues on his own behalf and on behalf of a class of persons under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

266.    Plaintiff brings his New York Labor Law claims on behalf of all persons who were employed by Defendants at any time during the six year period preceding the filing of the complaint in this action (the "Class Period") who were non-exempt employees within the meaning of the New York Labor Law and were compensated: at rates less than the applicable minimum wage for straight time hours; at rates less than one-half times the applicable minimum wage for all hours worked in excess of forty (40) hours per workweek; and without the required "spread of hours" premium, all in violation of the New York Labor Law (the "Class").

267.    Upon information and belief, the persons in the Class identified herein are so numerous that joinder of all members is impracticable. Although the identity and precise number of such persons is unknown, and the facts upon which the calculation of that number may be ascertained are presently within the sole control of the Defendants, the Class consists of all non-managerial current and former employees and, therefore, is so numerous that joinder is impracticable and most of whom would not be likely to file individual suits because they lack financial resources, access to attorneys, or knowledge of their claims.

268.    The claims of Plaintiff are typical of the claims of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation, where individuals lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant.

269.    The Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

270.    Plaintiff has committed himself to pursuing this action and have retained counsel experienced in employment law and class action litigation.

1.    Plaintiff will fairly and adequately protect the interests of the NY Class members. Plaintiff understand that, as class representative, he assumes a fiduciary responsibility to the Class and Collective Action Members to represent their interests fairly and adequately, and that he must consider the interests of the Class and Collective Action Members just as he would represent and consider his own interests, and that he may not favor his own interests over those of the Class or Collective Action Members.

271.    Plaintiff recognizes that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Class and Collective Action Members. Plaintiff understands that in order to provide adequate representation, he must remain informed of litigation developments and he understands that he may be called upon to testify in depositions and at trial.

272.    Plaintiff has the same interests in this matter as all other members of the Class and Plaintiffs claims are typical of the Class.

273.    There are questions of law and fact common to the Class which predominate over any questions solely affecting the individual members of the Class, including but not limited to:

a.    Whether the Defendants employed Plaintiff and the Class members within the meaning of the New York Labor Law;

b.    Whether the Defendants failed to keep true and accurate time and pay records for

all hours worked by Plaintiff and the Class members;

c.  What proof of hours worked is sufficient where the employer fails in its duty to maintain time records;

d.   Whether the Defendants failed to pay the Plaintiff and the Class members the applicable minimum wage for all straight time hours worked and the required overtime compensation for all hours worked in excess of forty (40) hours per workweek, in violation of the New York Labor Law and the regulations promulgated thereunder;

e.  Whether the Defendants failed to pay the Plaintiff and the Class members "spread of hours" premium for each day they worked a shift in excess of ten (10) hours, in violation of the New York Labor Law and the regulations promulgated thereunder;

f.  Whether the Defendants' violations of the New York Labor Law are willful as that term is used within the context of the New York Labor Law; and,

g.  Whether the Defendants are liable for all damages claimed hereunder, including but not limited to compensatory, liquidated and statutory damages, interest, costs, attorneys' fees, and costs and disbursements.

## STATEMENT OF CLAIM

### COUNT I

### FLSA Collective Claim for Unpaid Overtime

### (29 U.S.C. § 207, et seq.)

274.    Plaintiff re-alleges and re-avers each and every allegation and statement contained in paragraphs above as if fully set forth herein.

275.    At all relevant times, Plaintiffs and similarly situated employees ("Collective Action Members") were non-exempt employees entitled to overtime compensation under the FLSA.

276.    Defendants are employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, and each had annual gross revenues exceeding $500,000 during the relevant period.

277.    Plaintiffs and Collective Action Members regularly worked in excess of 40 hours per workweek. Despite this, Defendants willfully failed to pay the legally mandated overtime premium of one-and-one-half times their regular hourly rates for all hours worked in excess of 40.

278.    Defendants knew or should have known that Plaintiffs and similarly situated employees were entitled to overtime under the FLSA, yet deliberately denied them these wages.

279.    Defendants have failed to make, keep and preserve records with respect to each of its employees sufficient to determine the wages, hours and other conditions and practices of employment in violation of the  FLSA, 29 U.S.A. §§ 201, et seq., including  29 U.S.C.  §§ 21 l(c) and 215(a).

280.    Defendants failed to properly disclose or apprise Plaintiff and the Collective Action Members of their rights under the FLSA.

281.    As a result of Defendants' willful and unlawful conduct, Plaintiffs and Collective Action Members have suffered damages, including unpaid overtime wages, in an amount to be determined at trial, plus liquidated damages, attorneys' fees, costs, and interest.

## COUNT II

*Rule 23 Class Claim for Violations of New York Labor Law Minimum Wage and Overtime Provisions*

*(NYLL §§ 650, et seq.; 12 NYCRR Part 146, et al., Requiring (a) minimum wage for all hours worked, (b) time-and-one-half the regular hourly rate for hours over 40 per week, and (c) additional hour of pay at the minimum wage rate for each shift over 10 hours)*

282.    Plaintiff alleges and incorporates by reference the allegations in paragraphs above as if set forth fully and at length herein.

283.    Plaintiffs and the proposed Rule 23 Class Members are or were employed by Defendants within the meaning of the NYLL. Defendants had a duty to pay at least the required minimum wage for all hours worked, overtime pay at one-and-one-half times the regular rate for hours in excess of 40 in a workweek, and spread-of-hours pay (i.e., one extra hour's pay at the minimum wage rate) for shifts or split shifts lasting over 10 hours in a day.

284.    Defendants willfully violated these requirements by: a. Paying straight time, rather than overtime premium, for hours worked over 40; b. In some instances, failing to pay even the minimum wage for all hours worked; and c. Failing to pay an additional hour at the minimum wage rate when the workday exceeded 10 hours.

285.    Defendants' willful violations are evident from their consistent underpayment practices, refusal to track or pay for overtime properly, and lack of accurate wage statements.

286.    Employers are required to pay a "spread of hours" premium of one (1) additional hour' s pay at the statutory minimum hourly wage rate for each day where the spread of hours in an employee's workday exceeds ten (10) hours.  New York State Department of Labor Regulations § 146-1.6.

287.    Defendants knowingly and willfully violated the rights of Plaintiff and the Class members by failing to pay "spread of hours" premium to Plaintiffs and the Class members for each day they worked in excess of ten (10) hours pursuant to New York State Department of Labor Regulations.

288.    Defendants failed to properly disclose or apprise Plaintiff and the Class members of their rights under the New York Labor Law.

289.    Defendants failed to furnish Plaintiff and the Class members with a statement with every payment of wages listing gross wages, deductions and net wages, in contravention of New York Labor Law § 195(3) and New York State Department of Labor Regulations § 146-2.3.

290.    Defendants failed to keep true and accurate records of hours worked by each employee covered by an hourly minimum wage rate, the wages paid to all employees, and other similar information in contravention of New York Labor Law § 661.

291.    Defendants failed to establish, maintain, and preserve for not less than six (6) years payroll records showing the hours worked, gross wages, deductions, and net wages for each employee, in contravention of the New York Labor Law§ 194(4), and New York State Department of Labor Regulations§ 146-2.1.

292.    At the time of their hiring, Defendants failed to notify Plaintiff and the Class members of their rates of pay and their regularly designated payday, in contravention of New York Labor Law § 195(1).

293.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class have suffered damages, including unpaid minimum wages, unpaid overtime wages, unpaid spread-of-hours premiums, liquidated damages, attorneys' fees, costs, and interest.

294.    Due to Defendants' NYLL violations, Plaintiff is entitled to recover from Defendants, individually and/or jointly, the difference between the wages paid and the wages that would have been owed pursuant to the minimums established by minimum wage, overtime and spread of hours law, together with maximum liquidated damages, reasonable attorneys' fees, and costs of the action, pursuant to N.Y. Labor L. § 663(1) and the regulations thereunder.

## COUNT III

### *Failure to Pay Earned Commissions Under the NYLL*

295.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

296.    Under the NYLL, commissions are wages that must be paid according to an agreed-upon plan or formula. Defendants were obligated to pay Plaintiffs and similarly situated employees any commissions they earned.

297.    Plaintiffs and numerous other employees sold phones, plans, and accessories under a commission-based scheme described verbally by management. Defendants, however, did not maintain written commission agreements in accordance with NYLL requirements.

298.    Defendants frequently underpaid, delayed, or failed to pay commissions altogether—even when employees satisfied the stated sales metrics.

299.    Plaintiffs who attempted to track and verify their own sales discovered that actual commission payments were lower than the amounts to which they were entitled.

300.    By failing to pay earned commissions, Defendants have willfully violated the NYLL and caused Plaintiffs and similarly situated employees to suffer significant financial losses.

301.    Plaintiffs and the similarly situated employees are entitled to recover all earned

but unpaid commissions, together with liquidated damages, prejudgment interest, attorneys' fees, and costs.

## COUNT IV

### *Failure to Provide Accurate Wage Notices and Wage Statements*
### *(NYLL § 195)*

302.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

303.    The NYLL and its regulations require employers to provide employees, at the time of hiring and on an annual basis, with a wage notice containing specific information, including the employee's rate of pay, overtime rate, and regular payday. (NYLL § 195(1)).

304.    The NYLL also requires that employers provide employees with wage statements each time wages are paid, listing the dates covered, the rate or rates of pay, gross wages, deductions, allowances (if any), and net wages. (NYLL § 195(3)).

305.    Defendants failed to provide the required wage notices at hiring or annually. Defendants also failed to issue legally compliant wage statements, as many Plaintiffs and similarly situated employees received no written statements or received statements omitting critical information (e.g., actual hours worked, overtime rates, and accurate commission details).

306.    Due to Defendants' violations of NYLL § 195(1) and § 195(3), Plaintiffs are entitled to recover statutory penalties for each workday during which the violations occurred, along with attorneys' fees and costs, as provided by NYLL §§ 198(1-b) & 198(1-d).

## COUNT 5

### *Pregnancy Discrimination Under the NYSHRL*

### *(N.Y. Exec. Law § 296)*

### *(By Lesser Work Conditions and/or Termination)*

307.    Plaintiffs reallege and incorporate by reference all preceding paragraphs, particularly those describing the discrimination faced by Plaintiffs Stephanie, Rebecca, and Nicole (collectively "Pregnant Plaintiffs").

308.    Under the New York State Human Rights Law (NYSHRL), it is unlawful for an employer to discriminate against an individual based on pregnancy. (N.Y. Exec. Law § 296).

309.    Pregnant Plaintiffs experienced adverse employment actions, including:

310.    Stephanie: Terminated shortly after disclosing her pregnancy and taking a medically necessary absence.

311.    Nicole: Relocated to lower-volume stores, subjected to increased scrutiny, and ultimately fired on a pretextual basis after her pregnancy was discovered.

312.    Rebecca: Subjected to heightened scrutiny and differential treatment after informing management of her pregnancy, which contributed to her constructive discharge.

313.    Defendants' conduct constitutes unlawful discrimination on the basis of pregnancy. Pregnant Plaintiffs were treated less favorably than non-pregnant employees, were denied reasonable accommodations, and faced termination or worsened conditions because of their pregnancy status.

314.    As a direct and proximate result of Defendants' actions, Pregnant Plaintiffs suffered lost wages, emotional distress, and other damages. Pregnant Plaintiffs seek all remedies

available under the NYSHRL, including back pay, front pay, compensatory damages, emotional distress damages, punitive damages where appropriate, attorneys' fees, and costs.

## COUNT 6

### *Pregnancy Discrimination Under the NYCHRL*

### *(N.Y.C. Admin. Code § 8-107)*

### *(By Lesser Work Conditions and/or Termination)*

315.    Plaintiffs reallege and incorporate by reference all preceding paragraphs, particularly those describing the discrimination faced by Plaintiffs Stephanie, Rebecca, and Nicole who worked in New York City or who experienced the impact of discriminatory decisions that occurred in or emanated from New York City corporate offices.

316.    Under the New York City Human Rights Law (NYCHRL), it is unlawful for an employer to discriminate against an individual based on pregnancy. (N.Y.C. Admin. Code § 8-107).

317.    Defendants' conduct in subjecting Pregnant Plaintiffs to adverse actions—harassment, heightened scrutiny, reassignment to less favorable conditions, and/or termination—violated the NYCHRL's broad protections against pregnancy discrimination.

318.    As a direct and proximate result of Defendants' NYCHRL violations, Pregnant Plaintiffs suffered economic losses, emotional distress, and other compensable injuries. They are entitled to the full range of relief permitted by the NYCHRL, including compensatory damages, emotional distress damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT 7

### NYSHRL Retaliation

### (N.Y. Exec. Law § 296)

### (For Requests to Accommodate Due to Pregnancy)

319.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

320.    The NYSHRL prohibits retaliation against employees who request accommodations for pregnancy or related conditions. Such retaliation can include any adverse employment action (e.g., firing, demotion, reduced hours, or other punitive changes).

321.    Pregnant Plaintiffs requested or needed accommodations related to pregnancy (e.g., time off for medical visits, short absences due to complications, or limited lifting). In response, Defendants took adverse actions, up to and including termination.

322.    Defendants' retaliatory actions violate the NYSHRL. Defendants' intent is shown by the temporal proximity between Plaintiffs' requests for accommodation (or disclosure of pregnancy-related needs) and the adverse actions.

323.    As a result, Pregnant Plaintiffs suffered damages, including lost wages, emotional distress, and other injuries, and they seek relief under the NYSHRL, including compensatory and punitive damages, attorneys' fees, and costs.

## COUNT 8

### NYCHRL Retaliation

### (N.Y.C. Admin. Code § 8-107(7))

### (For Requests to Accommodate Due to Pregnancy)

324.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

325.   The NYCHRL also broadly prohibits retaliation against individuals who request accommodations or otherwise assert rights protected by the law, including pregnancy-related accommodations. (N.Y.C. Admin. Code § 8-107(7)).

326.   By punishing, harassing, transferring, or terminating Pregnant Plaintiffs for seeking or needing pregnancy-related accommodations, Defendants engaged in unlawful retaliation.

327.   The adverse actions closely followed or directly responded to requests or needs for accommodations, evidencing retaliatory motive.

328.   Defendants' retaliatory conduct caused Pregnant Plaintiffs economic harm, emotional distress, and other losses. Under NYCHRL, these Plaintiffs seek back pay, front pay, compensatory damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of himself and all similarly situated Collective Action Members and Class members, respectfully request that this Court grant the following relief:

 i.    An award for unpaid minimum wage and unpaid overtime compensation due under the FLSA and New York Labor Law;

 ii.    An award of unpaid "spread of hours" premium due under the New York Labor Law;

 iii.    An award for damages arising out of Defendants' illegal wage deductions and failure to reimburse employees for the cost of purchasing and maintaining required work uniforms;

 iv.    An award of liquidated damages as a result of Defendants' failure to pay minimum wage and overtime compensation pursuant to 29 U.S.C. § 216;

 v.  An award of liquidated damages as a result of Defendants' failure to pay minimum wage compensation, overtime compensation and "spread of hours" premium pursuant to the New York Labor Law and the New York State Wage Theft Prevention Act;

 vi.  An award of civil penalties pursuant to the New York State Wage Theft Prevention Act;

 vii.  An award of prejudgment and post-judgment interest;

 viii.  An award of costs and expenses associated with this action, together with reasonable attorneys' and expert fees; and

 ix.  Such other and further relief as this Court determines to be just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues.


Dated: New York, NY
   March 18, 2025

         **LAW OFFICE OF MOHAMMED GANGAT**

         Mohammed Gangat, Esq.
         Eliseo Cabrera, Esq.
         675 Third Avenue, Suite 1810,
         New York, NY 10017
         mgangat@gangatpllc.com
         718-669-0714

         *Attorneys for Plaintiff*